Ok, our last case for argument, Piotrowski v. Menard, Mr. Vosicky. Good morning, Judge. For the record, my name is Joe Vosicky. I'm here on behalf of Hannah and James Piotrowski. I'm requesting a reversal of Judge Rowland's decision on a motion for summary judgment. I would like to make three points. One is that the most important issue in this case is that we are not talking actually about a foreign substance. Here we're talking about a hazardous condition. And under a case involving a hazardous condition, the case law that we have cited indicates that no notice is required because Menard's, in this case, already knew about the hazardous condition. So the issues of actual notice and constructive notice dissolve. The second issue that I'd like to bring up, I'd like to discuss, is Judge Kendall's ruling in the coffee case, which was within the last year. And in that case, Judge Kendall distinguishes the Zipardi case, the Donahoe case, with the coffee case. Is this her ruling on the district court? Judge Kendall, I believe, was appointed by designation to hear a case, and the case that she actually wrote the opinion on the Zipardi case. Is it a ballot court decision or a district court decision? The coffee case is a district court decision. The Zipardi is a district court decision. It's an interesting coincidence of fact. Judge Kendall's ruling and Judge Roland's ruling really is not applicable to this instant case. It had to do with a foreign substance on the case. It had to do with water on the floor, which is something that could evaporate. It was a temporary condition. And, in fact, all the cases that have been cited by Menard's have to do with temporary conditions. What we're talking about in this case is a planter that was built. It's a very large planter, 16 feet long, 8 feet wide, 3 1⁄2 feet tall, that was built in the 1950s. It is right beside the exit at Menard's store where Mrs. Piotrowski left just before she fell approximately 15 feet from the exit. The planter is filled, is big enough to accommodate a tree and a bush. The top of it is filled with River Rock. River Rock is, in fact, a product that they sell in the store. In this particular case, River Rock is, in fact, a display. Just as in the coffee case, it's a display or used as an advertisement. The River Rock is multicolored and is almost indistinguishable from the pavement below it. It also contains rocks that are easily rollable. Mr. Krause, who is the manager for Menard's... Are these the little round River Rocks? I don't mean round, but curved, curled? Yes, Judge, but the testimony is that the River Rock is in varying shapes. Sometimes one to two inches long. It rolls if you step on it. That's right. From pictures of River Rock, I'm not sure if I've actually seen a live River Rock, they are curved. Is that what makes them dangerous, the fact that if you step on it, it may scoot out from under your foot? Yes, they roll, and that's precisely what happened in this case. Mrs. Petrowski stepped on the rock and she rolled her foot and fell down. And really the essence of Menard's case was the fact that the supervisor said he walks around all the time and he never saw the rock. Yes, Judge. And that's very similar to the JASCO case that was cited in our brief. Because they recognized that there was a hazardous condition in this River Rock, so they're always patrolling the parking lot to make sure to see whether or not there's rock there. And I assume what's sold at the store in Menard's comes in some kind of plastic bag. In fact, it is sold by Menard's in large 40-pound bags, yes, and they're sold by Menard's. So, I mean, it's unlikely that a customer who purchased such a bag was having a leaky bag that led to the stones being left, the rocks being left. Probably, you're correct. And further, there's a separate exit for the store for people that are getting large items like a bag of River Rock. Because they have to use that platform, probably that cart thing. Yes. Because of the weight. Because of the weight of the rocks. That would be right. So, there was a regular inspection. Was it at 6 a.m. and 10 a.m. or 6 a.m. or 10 a.m.? My understanding is that there are regular inspections. I believe the testimony is that Mr. Krause, who's the store manager, gets there in the morning, he makes an inspection, and that other people in the store, when they come into the store from their cars, take a look at the parking lot to see if there's anything there. Just in the morning, though. But is there some afternoon? I believe it's an ongoing process. It's in the JASCO case that was mentioned with the pizza that was falling, when they talk about the issue about the method. It's the method that is dangerous. And in this case, we're saying that it's the planter that is creating this hazard. And I think it's the inference. There was a geologist that took a look at the composition of the rock that Mrs. Piotrowski stepped on and said that it was granite. He, in fact, tested the samples from the bags of river rock. There's granite there. There's a reasonable inference that the rock that Mrs. Piotrowski stepped on is, in fact, a rock that came from the planter that was there. How does it come from the planter? I mean, it doesn't jump out by itself. Is it that kids pick them up and throw them around? It's a possibility because the assistant manager, the front manager testified, Rodriguez testified, that she had seen children playing in the planters. And they do have to replenish it from time to time, right, which suggests that someone is moving it. That judges our point, is that there's three people that replenish it. Mr. Krause, the manager, whenever it looks fair, other employees under his direction, and, in fact, Rodriguez testified that when the landscapers come to do whatever they do at Menards, they, if necessary, they replenish it. So the rock is going somewhere, and it's reasonable to assume that it's going on the parking lot. And it's also reasonable, I think, the foreseeability, it's easy to foresee that an accident like Mrs. Pietrowski's accident is going to happen. It's just a matter of time. And it did. And we're saying that there is an inference, a reasonable inference that Mrs. Pietrowski stepped on, in fact, one of these river rocks, and that we should at least be able to take this case to a jury and let them make the final determination as to liability and, of course, the extent of the damages. And has she ever recovered from this fall? Because she had four hospitalizations and three surgeries from this. She has not. She's had seven surgeries, and she will likely have to have another replacement down the road. She has a permanent disability. She can't lift more than 10 pounds. What was the nature of the injury? She fell down on her right elbow, and she broke the radial condyle in the elbow. She had to have a ñ they initially tried to put in some sort of a device that would allow her elbow to work. That didn't make it. They had to put in ligaments. The ligaments, that did not work, and they punctured her lung as a result of putting the ligaments in. When she went in to see the doctor about the punctured lung, the contraption that had been put in popped, and she had to go in for a complete replacement. Part of the replacement that was put in became infected. The whole replacement had to be removed. The infection was gone, and they had to have another replacement. How old was she? She was 63 at the time, and this is about three, actually four years ago. I see that my time appears to be up. Initially, I'd like to reserve some time for rebuttal. Okay. Thank you. Ms. Milos. Thank you, Your Honors. May it please the Court, Counsel. My name is Nicole Milos. I'm here on behalf of Menard, the appellee. If I can begin with a few comments based on what Counsel has offered to you.  However, there is no evidence that at any time there was ever any reports or complaints of rocks in the parking lot, of rocks falling from this planter, of people tripping or slipping as a result of rocks, or having an incident regarding the planter, either because they fell into the planter or what have you. With regard to Your Honor's question with regard to the rocks going somewhere, the testimony from Mr. Krause was that in the spring, after the wonderful Chicago winters that we all endure, the planter would generally look like it needed to be replenished, as did most of the greenery around the Menard store area, because there is settling that can occur. So therefore, there has been actually no testimony that the planter was at any point overfilled, as Counsel remarks in his brief, nor has there been any testimony that the rocks were actually falling out of the planter. All that we know is that Mrs. Piotrowski and her husband came to Menard, they bought some items from Menard, they exited the Menard. The planter, according to the various witnesses' testimony, is 50 to 125 feet away from where she ultimately fell. She and her husband were walking on their way to their parked vehicle, they were in the driving lane of traffic, and she fell. After she fell, she straightened her leg and she saw two rocks on the ground. Her husband picked up those rocks so no one else saw them on the ground prior to her incident at all, or after her incident. There was a gentleman named Miguel Guzman who was loading drywall in his vehicle. He estimated that Mrs. Piotrowski was approximately 4 to 5 feet from him at the time that she fell. He didn't see her fall per se, but saw the motion of someone falling and turned to see what had happened. He said that he specifically uses this Menard store because it is kept so clean and because they keep it up so much. He saw no rocks on the floor, and his explanation for how these two rocks could have come to be on the driving lane was perhaps they fell from a customer's vehicle, from the tire, because they were so small they would have fit in the tire rut. And since Menard sells home improvement items and sells things to contractors, it was a possibility, as far as he felt to be reasonable, that they came from a customer's vehicle. So that is why, Your Honor, it is our belief that the district court correctly held that this incident and the allegations herein are based on speculation, guess, and conjecture. This case, much like Zupardi or Kimbrough, is a case where the seminal line of Illinois cases where one must present an example that it is more likely than not something is caused by X. So the testimony of the manager who inspected this planter. Mr. Krause. So what was the reason why he inspected it? Because he inspects everything on the property. That's part of his job. His job when he enters the property, I should address this, and I apologize for not addressing it sooner. When Mr. Krause arrives at the property, if he's not the general manager that day, the next person below him, the assistant manager, will act as the general manager. Whoever is acting as the general manager every day when they arrive on the store is first taxed with walking the entire premises, parking lot included, and making sure that everything is in its proper place and that there are no tripping, slipping, falling hazards anywhere. He then, throughout the day, relies upon the Menard carryouts, and if you're not familiar with the phrase, carryouts are the people who are employed to go out and fetch grocery carts, or in our case the carts and racks that people use. What is that word you use? A carryout. A carryout. Carryout. I say carryout and people look at me strangely, so I want to make sure everybody understands what I mean. The carryouts are also tasked, in addition to retrieving these items, with making sure that the parking lot is free and clean from debris. Aside from the manager making the walk every day and the carryouts, the team members, which are what Menard calls their employees, team members park at the very back of the parking lot and come into the store. They are tasked with, when they come into the store and when they exit the store, again, on their path back and forth to their vehicle, checking to make sure that there are no hazards in the parking lot. At no time on this day, when Mrs. Piotrowski fell, or in fact in the past were there any complaints that someone had reported rocks in the parking lot, debris in the parking lot, tripping hazards in the parking lot, anything of that nature. I hope that answers your question. And what size? You were saying it could be in the wheel rim. What size were these rocks? They were estimated to be, well, first of all, you actually can hold them both in your hand. So if you were to put them in the palm of your hand, they will both fit there. They have been estimated to be no more than an inch. And the record, should you wish to go back and review, I apologize. The photographs of the rocks are at document number 51, page 40, if you want to go back and look. But the testimony is that the rocks actually fit into the palm of Mr. Piotrowski's hand. I've held them myself. I have no reason to contest that. And they are about an inch each. So the point that Mr. Guzman was making was, if you are driving a van or a construction truck, they would easily fit within the tread of that tire. And that, I believe, is where Judge Rowland was relying when she issued her memorandum opinion and correctly found that there are a multitude of possibilities as to where these rocks came from, and none of them are more likely than the other. In all of these instances, the rocks could have come from, and in fact, the Piotrowskis even admit that there are multiple ways in which the rocks could have come to be on the ground. They could have come to be on the ground because they came from a I'm sorry, Your Honor, I'm trying to be as entertaining as I can. The rocks could have come from a customer carrying a bag in which the rocks fell. A customer could have taken rocks from the planter itself and walked them to their vehicle. A child could have dropped these rocks. What I want the Court to remember here is this case is built upon one assumption after another. First, that Mrs. Piotrowski fell on river rock. Next, that the river rock came from the planter. Next, that the river rock came from the planter because the planter was overfilled. Next, that the river rock came from the planter because the planter was overfilled and the rock fell out of the planter. Now, next, these activities happened on a frequent and relatively frequent basis. So Menard should have known. Next, that this happened on a relatively frequent basis and somehow, as Your Honor pointed out, these rocks traveled 50 to 125 feet into the parking lot. And we are not talking about a series of rocks or a shovel's worth of rocks. We're talking about two rocks sitting together on the parking lot surface. Now, according to the I will probably mispronounce this case name, so I apologize. I say Haressel, the H-R-E-S-I-L case. I don't know if it's pronounced Haressel or Ressel, but it is cited in our brief. I would like to direct Your Court's attention to the law which they or to the reasoning where they stated to charge the store with constructive notice upon would place the store with an unfair requirement of constantly patrolling. I think that's what we have here. We have an issue where there are no prior complaints. There is only speculation, guess, and conjecture as to how these rocks came from, if in fact they did, this planter and traveled to the parking lot. And in order to hold Menard responsible, then at any point in time when something is in their parking lot, Menard would be liable for it. And that is simply not what the Illinois law requires. We are not here today because Mrs. Piotrowski is injured or is damaged. We're not here to debate those issues. We're not here to debate her age or her loyalty to her employer. We're not here to debate the fact that she has gone through many more medical procedures than she should have. We're not here to debate any of that. What we're here to debate is whether the district court correctly held that Menard was entitled to summary judgment. This is not like coffee. This incident did not occur in the Menard store. It happened in the parking lot with two rocks that there is still a question of fact as to whether they, in fact, fell as a result of Menard's negligence. For all of these reasons, we believe that the district court's granting of summary judgment should be affirmed. There's nothing else, Your Honors? Okay. Thank you very much, Ms. Mills. Thank you very much. To Fosicky? Fosicky? Do you have a minute? Judge, just a few points I would make. All the five cases that we cited in our briefs are all cases where it was a first instance. In each of those cases, there had not been a previous problem. The testimony as to the amount of feet from between the incident and where the planter was, was anywhere from 15 feet to 175 feet. Judge Rowland basically weighed the evidence and made an average and came up with something like an average at about 50 feet. In fact, I believe Judge Rowland was weighing the evidence, which is not her role in this motion for summary judgment, and that she must take all of the evidence in a light most favorable to the plaintiff and the non-moving party. The rocks that we're talking about had actually been photoed on the spot. Menards came out immediately. All this was done within 15 minutes of the incident. It's totally clear as to what happened. Mrs. Piotrowski has the rocks. The rocks, according to the geologist that inspected them, fit together so that the two rocks were probably as one rock, which would have easily caused somebody to roll. Let me ask you this. In terms of refilling the rock planter, I should have asked counsel, was there any evidence other than that like once a year when the winter was over and, according to her, rocks sunk into the planter and then had to be replenished then but no other replenishment? Was there any evidence on that? No. The testimony is that it's replenished routinely. It's replenished whenever it looks bare, and that would be a determination either that was made by Kraus, the manager, or by somebody that is under him, a worker there, or also by the landscaper that comes out, so that two people testified as to the replenishment of the rock, which is done on a regular basis. Is the replenishment necessary because people are stealing the rocks? Judge, why exactly the replenishment takes place is, I think, is a matter to be taken up by a jury, and that's what we're asking for is that this case, that the ruling from Judge Rowland be reversed and that we have an opportunity to take this case to a jury because I think there is a reasonable inference that these rocks come because of the hazardous condition that was created. Thank you.  Well, thank you very much to both of you. Thank you. The case will be taken under advisement and the court will be in recess. Thank you.